779 F.2d 1011
 Joseph J. BONAVIRE and Richard G. Reckner, Appellees,
v.
E. James WAMPLER and Dorfmeier, Stone and Wampler, Appellants,
and
Unlimited Financing, Inc.; Charles L. Ellington; Constance
Ellington; Carl A. Boyden and Sherri Wampler, Defendants.
 No. 84-2155.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 8, 1985.
Decided Dec. 26, 1985.
 
 1
 Wayne F. Cyron, Miller, Miller, Cyron & Kearney, Arlington, Va., and James C. Gregg, Washington, D.C., for appellants.
 
 
 2
 Vail W. Pischke, Falls Church, Va., and Thomas Woehrle and George E. Tubble, Jr., Springfield, Va., for appellees.
 
 
 3
 Before WINTER, Chief Judge, WILKINSON, Circuit Judge and McMillan, District Judge (sitting by designation).
 
 McMILLAN, District Judge:
 
 4
 On July 31, 1984, a jury in the United States District Court for the Eastern District of Virginia found defendant Wampler and others guilty of defrauding plaintiffs Bonavire and Reckner, and awarded compensatory and punitive damages. Judgment was entered for plaintiffs. Defendant Wampler and the law firm of Dorfmeier, Stone and Wampler appealed. They question the sufficiency of the evidence on the issues of (1) plaintiffs' reliance on defendant Wampler; (2) plaintiff Reckner's efforts to take reasonable business precautions in investigating the transaction; (3) plaintiffs' lost profits; (4) the existence of a partnership by estoppel between defendant Wampler and attorneys Stone and Dorfmeier; and (5) the partnership's ratification of Wampler's conduct. Finding that there was ample evidence in the record to support the jury's verdict, we affirm.
 
 The record reveals the following:
 
 5
 On November 17, 1982, after overtures from defendant Carl Boyden, plaintiffs met Boyden and one Herbert Coles in Tysons Corner, Virginia, to discuss what Boyden represented as an investment opportunity. Boyden represented that unnamed foreign entities were interested in investing several billion dollars in the United States, and that an unnamed United States bank was trying to borrow a comparable sum. The condition of such loan was that the bank would have to pledge several promissory notes as collateral for the loan of two billion dollars. Boyden suggested that the bank would be willing to pay a fee of what amounted to two percent of the two billion dollars to anyone who could arrange the loan and produce the necessary letters of credit as security for the transaction. Defendant Boyden proposed that plaintiffs retain Unlimited Financing, Inc., operated by defendant Charles Ellington, to obtain the necessary documents and arrange for the interested bank to borrow the two billion dollars. Ellington's services could be retained by the plaintiffs for a fee of $60,000.00, to be divided equally between the plaintiffs. The plaintiffs expressed interest in sharing the proposed return of forty million dollars on a $60,000.00 investment, and defendant Boyden arranged for each plaintiff to meet with Mr. Ellington in Dayton, Ohio (App. 58).
 
 
 6
 Two days later, on November 19, 1982, plaintiff Reckner met with Ellington in Dayton, Ohio. Ellington presented Reckner with a copy of a "Guarantee Consulting Agreement" for Reckner's signature. This agreement stated that Unlimited Financing would either produce real documents as the necessary collateral or return the $60,000.00 fee to the plaintiffs. Plaintiff Reckner reviewed the agreement at Ellington's home but did not sign it until he had met with defendant Wampler at the offices of the law firm Dorfmeier, Stone and Wampler. After speaking with defendant Wampler about the deal and his role as the escrow agent for the transaction, Reckner asked that an addendum be attached to the consulting agreement (App. 89). This addendum, drafted by defendant Wampler in his office, stated that the agreement was conditioned on the equal participation of both plaintiffs and permitted the return of any deposited funds in the event that either man failed to keep his part of the agreement (App. 243).
 
 
 7
 In early December, plaintiff Bonavire also traveled to Dayton to meet with Ellington (App. 100). Bonavire brought with him a check for $11,000.00 and planned to send the remainder of the promised $30,000.00 after meeting with Ellington and signing the consulting agreement. At Ellington's home, Ellington and Bonavire discussed the deal and Ellington informed Bonavire that defendant Wampler would act as the escrow agent (App. 151). Ellington then gave Bonavire Wampler's telephone number. Bonavire telephoned Wampler at his office and had a brief conversation with him about Wampler's knowledge of the deal and his experience with Ellington (App. 102). Bonavire then signed the consulting agreement at Ellington's home and subsequently arranged to deliver the additional $19,000.00 to complete the transaction with Ellington.
 
 
 8
 On December 14, 1982, plaintiff Reckner returned to Dayton and met again with Boyden, Ellington and other investors involved in parallel arrangements with Unlimited Financing, Inc. This meeting took place in the offices of Dorfmeier, Stone and Wampler and was conducted by Ellington, with defendant Wampler coming in and out during the course of the meeting (App. 84). At this meeting, Ellington presented a letter that purportedly represented an agreement by the Manufacturer's Hanover Bank of New York to secure the loan transaction. The letter, presented as the promised collateral, was addressed to defendant Wampler (App. 221, 253). The letter aroused the suspicions of the investors, some of whom were accompanied by counsel.
 
 
 9
 Plaintiff Reckner questioned the authenticity of the letter because it did not appear to bear a bank seal and seemed to be a copy, rather than an original document. Consequently, plaintiff Reckner refused at that time to sign a release turning over the money in Wampler's escrow account to Ellington. The next day the group assembled again in the law firm's offices. Defendants Boyden, Ellington and Wampler met in a conference room with several other investors and advisors but kept plaintiff Reckner out of the meeting. When the meeting broke up, defendant Boyden told Reckner that the deal would fail if he refused to sign the release. Boyden also told him that his money was already gone anyway, and that he might as well sign. Plaintiff Reckner hesitated but, distressed by Boyden's statements, signed the release prepared by defendant Wampler. Wampler then wrote a check to Ellington for $30,000.00.
 
 
 10
 At approximately this same time in mid-December, plaintiff Bonavire learned from defendant Boyden that no guaranteed letter of collateral had been obtained by Ellington (App. 105). Soon thereafter, in early January, plaintiff Reckner traveled to New York and went to the Manufacturer's Hanover office from which the collateral document had supposedly been sent. The Manufacturer's Hanover employees with whom Reckner spoke denied that the bank ever sent such a letter and informed Reckner that the two bank representatives whose signatures appeared on the letter were not employed at the bank. On January 24, 1983, both plaintiffs met again with the defendants at the law firm offices in Dayton and discussed the authenticity of the letter that had been offered as the promised collateral for the loan. Plaintiff Reckner did not initially reveal his trip to New York and his discoveries there. Reckner asked again to see the purported Manufacturer's Hanover letter, being held by Wampler. The defendants refused to give the letter to the plaintiffs and plaintiff Bonavire finally pulled the document out of Wampler's hand and revealed that Reckner had gone to New York and found out the letter was a fake (App. 106). At this point, the arrangement between the parties appeared to have collapsed. However, plaintiffs' money was not returned to them as promised.
 
 
 11
 In October of 1983, plaintiffs filed this lawsuit to recover their investment and damages.
 
 
 12
 * * *
 
 JURISDICTION
 
 13
 Defendants challenged both subject matter jurisdiction and personal jurisdiction over the appellants.
 
 
 14
 As to subject matter jurisdiction, the plaintiffs filed a motion on October 1, 1985, several days before the hearing, requesting permission to amend the complaint to allege diversity of citizenship between the plaintiffs and all the defendants. That motion was allowed at the beginning of the appellate hearing. The facts clearly show such diversity of citizenship. There is subject matter jurisdiction.
 
 
 15
 At the appellate hearing, for the first time, the defendants made an [oral] objection to personal jurisdiction of the court over the appellants. That motion is not well taken. Though Boyden was the only defendant ever physically present in Virginia, he acted in Virginia as the soliciting agent for the enterprise in which appellants were involved (App. 99). Plaintiff Reckner testified that Boyden told him that he (Boyden) had a man named Ellington in Dayton who would arrange the profitable loan with the interested bank (App. 57). Later testimony revealed that Ellington engaged Wampler to act as the escrow agent for the loan and to offer assurances to the plaintiffs about the loan arrangement. Boyden's acts in enticing the plaintiffs to participate in the fraudulent scheme are attributable to all defendants and provide a basis for jurisdiction over them.
 
 
 16
 RECKNER'S RELIANCE ON WAMPLER AND RECKNER'S EFFORTS TO MAKE
 
 PRECAUTIONARY INVESTIGATIONS
 
 17
 According to plaintiff Reckner's testimony, defendant Wampler played a critical role in assuring Reckner that the deal in question was workable and that Ellington was a reputable businessman. When plaintiff Reckner came to Dayton for the first time in November of 1982, he met defendant Wampler at his office and was informed by Wampler that Ellington was an "honest, straight-forward businessman" (App. 91) and that Wampler had "done this before" (App. 65). At the November 19 meeting, Wampler showed plaintiff Reckner a letter from a bonding company addressed to Wampler; the letter asserted that the collateral arrangement in which Reckner was about to participate was "a bondable situation" (App. 61). Mr. Wampler then prepared an addendum to the consulting agreement between Ellington and the plaintiffs and gave Reckner an agreement authorizing Wampler to keep Reckner's $30,000.00 in an escrow account pending the delivery of the collateral documents. This agreement, presented in the form of a letter from Wampler to Reckner, was drafted on the stationery of the law firm with which Wampler was associated (App. 64, 254). When Reckner returned to Dayton in mid-December, his meetings with Ellington and Boyden and the other investors were held in Wampler's office with Wampler coming in and out periodically. The letter produced at these meetings as the collateral guarantee from the New York bank was addressed to Wampler and was reportedly held in his safe until January of 1983.
 
 
 18
 This testimony from plaintiff Reckner was an adequate basis upon which the jury could find that defendant Wampler had made misrepresentations upon which Reckner relied in proceeding with the deal.
 
 
 19
 Defendant Wampler also contends that plaintiff Reckner failed to take reasonable business precautions and did not adequately investigate the details of the transaction before surrendering his money to the defendants. The trial judge properly instructed the jury that one who entrusts himself to the hands of one in whose interest it is to mislead him and who fails to take reasonable steps to determine the true circumstances of a suspicious business dealing will not be able to recover damages for fraud. The judge further advised the jury, however, that failure to take such investigatory precautions will not bar recovery if the defendants throw the plaintiff off his guard or prevent the plaintiff from making necessary inquiries. Plaintiff Reckner admittedly harbored suspicions about the authenticity of the Manufacturer's Hanover letter and consequently hesitated to sign the release. However, he was dissuaded by defendants from undertaking an investigation prior to signing the release. Defendants would not give the letter to Reckner for his actual inspection; instead, defendants Wampler and Ellington held the letter up for Reckner to read. They refused to allow him to hold it and examine it more closely. At that time, Reckner refused to sign the release. The next day, when Reckner returned to Wampler's office for another meeting with Ellington, Boyden et al., Boyden made coercive statements to Reckner, warning him that his lack of cooperation threatened to ruin the deal for everyone and that his money was already gone, and if he ever wanted to get it back or receive any return on his investment he had better authorize the release of the $30,000.00 from the escrow account (App. 72). Under such pressure, Reckner signed the release without further investigation. Again, this testimony by Reckner, corroborated by witness Jensen, another investor in a similar transaction present at the December meeting, is sufficient evidence to support the jury's finding that the defendants attempted to conceal the evidence of their trickery, the fake letter, from Reckner and then threatened him with the loss of his invested $30,000.00 if he did not sign immediately. In addition, the jury, in its appraisal of Reckner's duty to investigate the circumstances of the transaction, may have taken into account that the consulting agreement which Reckner and Bonavire signed assured the plaintiffs that their investment would be returned if authentic documents could not be produced to supply the required loan collateral. In light of this contractual assurance, the jury may have seen Reckner's eventual investigation and confrontation with the defendants in January as sufficient protection by Reckner of his own interest (App. 119).
 
 BONAVIRE'S RELIANCE ON WAMPLER
 
 20
 Although plaintiff Bonavire's contact with defendant Wampler was much more limited than that of plaintiff Reckner, Bonavire did testify that when he met with Ellington in Dayton in early December of 1982, Ellington gave him Wampler's telephone number and told Bonavire that Wampler would serve as the agent for the bank (App. 111). Bonavire then called Wampler who, according to Bonavire's testimony, said he would serve as the escrow agent. Wampler then assured Bonavire that Ellington could make the necessary arrangements by telling him that Ellington had done this kind of thing before and by saying that "if Charlie said he can do that, he can do that" (App. 102). After this conversation with Wampler, Bonavire signed the consulting agreement and handed the first $11,000.00 installment on the promised $30,000.00 to Ellington. Bonavire's testimony on this sequence of events presents sufficient evidence for the jury to conclude that Bonavire relied on and was misled by Wampler's verification of Ellington's credibility and the deal's feasibility.
 
 
 21
 SUFFICIENCY OF THE EVIDENCE TO SUPPORT AWARD OF LOST PROFITS
 
 TO THE PLAINTIFFS
 
 22
 The jury awarded both plaintiffs compensatory damages of $55,000.00, which is $25,000.00 more than their individual investments. Defendants Wampler, and Dorfmeier, Stone and Wampler, now try to present this additional $25,000.00 as an award for expenses incurred by the plaintiffs and correctly state that no evidence was presented by the plaintiffs to verify any such expenses. However, the colloquy between the trial judge and the attorneys prior to the judge's charge to the jury indicates that the possibility of awarding lost profits was going to be presented to the jury in light of the fact that the consulting agreement and various representations by defendants purported to guarantee a $40 million return on the $60,000.00 investment (App. 228-231). Thus, the additional $25,000.00 awarded each plaintiff may appropriately represent the jury's discounted assessment of plaintiffs' expected profits under the guarantee offered in the contract with Unlimited Financing, Inc.
 
 
 23
 * * *
 
 
 24
 LIABILITY OF DORFMEIER, STONE AND WAMPLER FOR ACTS OF
 
 DEFENDANT WAMPLER
 
 25
 The Virginia Code Sec. 50-16(2) defines the circumstances under which a partnership by estoppel can be found:
 
 
 26
 "When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation. Where all the members of the existing partnership consent to the representation, a partnership act or obligation results; but in all other cases it is the joint act or obligation of the person acting and the persons consenting to the representation."
 
 
 27
 The jury heard evidence that the names Dorfmeier, Stone and Wampler appeared on the door of the offices in which several of the meetings between plaintiffs and defendants were held. The jury also heard that an advertisement for "Dorfmeier, Stone and Wampler--A Full Service Law Firm" appeared in the Dayton Yellow Pages. The jury also saw that the escrow agreement between plaintiff Reckner and defendant Wampler was prepared on Dorfmeier, Stone and Wampler stationery. Finally the jury heard witness Jensen testify that defendant Wampler introduced Mr. Stone to Jensen as his partner. Stone did not disavow this designation but did say to Wampler at that time, "James, I hope you know what you're doing" (App. 125).
 
 
 28
 Taken together these pieces of evidence support conclusions by the jury that Wampler was a partner by estoppel in Dorfmeier, Stone and Wampler and that the firm ratified Wampler's fraudulent acts, thereby making itself liable to plaintiffs for compensatory and punitive damages. Although plaintiffs seem to have displayed a peculiar combination of naivete and avarice that made the defendants' job of defrauding them easier, ample evidence exists to support the jury's findings that plaintiffs were misled into contributing their $30,000.00 to the venture and were then deceived or coerced so as to prevent them from withdrawing their investments.
 
 
 29
 The judgment on the jury's verdict is AFFIRMED.